Louise M. **LYLE**, Administratrix of the Estate of Charles M. Lyle, Appellee,

v.

**EXXON CORPORATION d/b/a Exxon Company, U.S.A. and Petroleum Casualty Company, Appellants.**

Supreme Court of Tennessee, at Nashville.

March 7, 1988.

William D. Leader, Jr., Eugene N. Bulso, Jr., Boult, Cummings, Conners & Berry, Nashville, for appellants.

Jerry D. Mayo, Janie M. Johns, Nashville, for appellee.

## OPINION

FONES, Justice.

In this worker's compensation case the chancellor found that plaintiff, Charles M. Lyle, sustained a sixty percent permanent partial disability to the body as a whole due to a work-related accident. The chancellor awarded plaintiff his medical expenses, temporary total disability benefits, and permanent partial disability benefits. Defendant, Exxon Corporation, and its worker's compensation insurance carrier, Petroleum Casualty Company, have appealed.

On 6 September 1985, plaintiff was employed by defendant as a service station attendant at defendant's Briley Parkway service station in Nashville, Tennessee. At that time plaintiff was a sixty-five-year old male with an eighth grade education. Plaintiff had previously worked as a laborer and as a truck driver, and possessed no other occupational skills. Plaintiff's duties as a service station attendant for defendant included pumping gas and collecting money from customers, scrubbing the driveway, and emptying the trash barrels. The alleged accident that caused plaintiff's injury and subsequent disability occurred at approximately 3:30 a.m., on 6 September 1985, as plaintiff performed his duties for defendant.

On that particular morning, plaintiff was the only employee working at the station. According to plaintiff's testimony, he had emptied all of the station's trash cans into one large can, and had rolled this large trash can to the rear of the Exxon station where a dumpster was located. Plaintiff then attempted to empty the contents of the large trash can into the dumpster. Because this dumpster was full, plaintiff had to utilize the opening on top of the dumpster to empty the contents of the trash can. Plaintiff testified that as he lifted the trash can above his head to empty the can, he heard a "pop". Plaintiff stated he then felt a pain across his back, and he came down on his knees. After resting for a few minutes, plaintiff stood up and his back pain eased. According to plaintiff, at that time he thought he had pulled a muscle in his back. Plaintiff returned to the station area and returned to his duties. According to plaintiff, his back pain subsided during the remainder of the shift; however, he began to experience a throbbing pain in his legs. Plaintiff had experienced mild leg pain after walking prior to the morning of the accident, but this leg pain was stronger

than the pain he had previously experienced.

After completing his shift, plaintiff drove home. Plaintiff stated that he had difficulty driving that morning because of the pain in his legs. When he arrived home, plaintiff's wife helped plaintiff into the house. Plaintiff laid on the couch with a hot water bottle on his back, and plaintiff's wife rubbed his legs with liniment. Because of the pain he was experiencing in his legs, plaintiff instructed his wife to make an appointment with her doctor for him. In addition, he instructed his wife to call the station and inform the manager that he would be unable to work his scheduled shift that evening. Mrs. Lyle did call the station and informed the manager that her husband had problems with his legs and would not be able to work.

On 11 September 1985, plaintiff visited Dr. Ben J. Birdwell. Plaintiff informed Dr. Birdwell that he had been experiencing pain in his legs after walking for approximately three weeks. Plaintiff did not inform the doctor of the trash can incident. After a brief examination, Dr. Birdwell diagnosed plaintiff's condition as being intermittent claudication from peripheral vascular disease. According to Dr. Birdwell, this condition is common in older people, and leg pain is a classic symptom. He then referred plaintiff to a vascular surgeon, Dr. Gerald Burns.

Dr. Burns examined plaintiff on 13 September 1985, for pain in the calves and left hip, and subsequently admitted plaintiff to Donelson Hospital for diagnostic tests. An arteriogram revealed that plaintiff had some peripheral vascular disease, but Dr. Burns concluded that this did not explain plaintiff's symptoms. A CT scan was then performed, and this test revealed that plaintiff has spinal stenosis, a condition in which pain is caused by pressure placed on the spinal cord because of a narrowing of the spinal column. Dr. Burns stated that he felt plaintiff's condition was congenital, although he also stated that trauma could have aggravated this condition.

Plaintiff was referred to Dr. Don L. Gaines, an orthopedic surgeon, for treatment for low back pain and leg weakness. While plaintiff was still in the hospital, Dr. Gaines made a brief examination of plaintiff and examined the results of the CT scan. Dr. Gaines determined that plaintiff had a significant acquired spinal stenosis. Dr. Gaines testified that acquired spinal stenosis occurs when the spinal column fills over a number of years with minerals. According to Dr. Gaines, this condition is often aggravated when people work above their heads. Pain in the legs often occurs when people with this condition hyperextend their spines. On 30 September 1985, plaintiff was admitted to the hospital for a laminectomy and lateral recess decompression, elective surgery performed to relieve the pressure on the spinal column. The surgery was performed, and plaintiff was released from the hospital. According to Dr. Gaines, he did not obtain a full history on plaintiff until plaintiff visited him at his office after plaintiff's release from the hospital. According to Dr. Gaines' notes, this visit occurred on 16 October 1985. At that time plaintiff informed Dr. Gaines of the trash can incident, and Dr. Gaines informed plaintiff that the incident was directly related to plaintiff's leg problems. Dr. Gaines testified that plaintiff's history is consistent with an aggravation of a pre-existing spinal stenosis.

Plaintiff testified that this meeting was the first time he realized that his leg problems were caused by the incident at work. Plaintiff's wife then called Ron Hancock, the manager, and informed him that plaintiff's leg problems were caused by an accident that occurred at the station on the last day plaintiff worked. Mr. Hancock stated that this telephone conversation occurred on 10 October 1985. He stated that during the course of plaintiff's illness, Mrs. Lyle had contacted him on several occasions. According to Mr. Hancock, during these conversations, Mrs. Lyle told him that plaintiff had leg problems or varicose veins. He stated that the conversation with Mrs. Lyle on 10 October 1985 was the first time he was informed that plaintiff had injured himself at work.

Plaintiff testified that the surgery had relieved the pain in his legs. However, plaintiff stated that when he lifts anything his lower back hurts. According to plaintiff he is able to stand, but not squat, without pain. He stated that he experiences pain when he works with his hands or moves his head for extended periods. In addition, plaintiff stated that he is unable to bend over.

Dr. Gaines testified that plaintiff has a ten percent permanent physical impairment to the body as a whole as a result of his spine problem. Dr. Gaines stated that he has not placed any restrictions on plaintiff due to his injury; however, he stated that plaintiff is to use his "good judgment" when lifting objects. In addition, Mr. James Adams, a vocational expert, testified that he interviewed plaintiff and read Dr. Gaines' deposition. Mr. Adams testified that based upon the information he gathered on plaintiff's age, work experience, education and training, and physical limitations, plaintiff is one hundred percent vocationally disabled.

The chancellor found upon this evidence that plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant, and plaintiff had given defendant timely notice of the injury. The chancellor also found that as a result of the injury caused by the accident plaintiff sustained a sixty percent permanent partial disability to the body as a whole. Plaintiff was awarded a lump sum award of $53,204.23 for medical expenses, accrued temporary total disability benefits, and permanent partial disability benefits.

On 20 July 1987, defendant filed its notice of appeal. Plaintiff died on 14 September 1987, and defendant filed a Suggestion of Death Upon the Record of Charles M. Lyle on 7 October 1987. Upon motion and pursuant to Tennessee Rule of Appellate Procedure 19, an order of this Court was entered on 11 January 1988, substituting the administratrix of the Estate of Charles M. Lyle as plaintiff-appellee.

As this action arose after 1 July 1985, the scope of review by this Court of issues of fact is "de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." T.C.A. § 50–6–225(e).

The first issue presented by defendant on this appeal is whether the trial court erred in finding that plaintiff gave defendant timely notice of injury pursuant to T.C.A. § 50–6–201.

T.C.A. § 50–6–201 provides that notice must be given to the employer within thirty days after the occurrence of the accident, "unless reasonable excuse for failure to give such notice is made to the satisfaction of the tribunal to which the claim for compensation may be presented." If proper notice pursuant to this section is not given to the employer, the employer is not liable to the employee for worker's compensation benefits. T.C.A. § 50–6–201. Defendant notes that although the accident occurred on 6 September 1985, plaintiff did not inform defendant that his illness was the result of a work-related accident until 10 October 1985, thirty-four days after the accident. Defendant argues that the record clearly shows that plaintiff knew he had injured his back at work on 6 September 1985, and plaintiff did not present any reasonable excuse for the delay in notifying defendant of the accident. Therefore, defendant concludes that plaintiff is not entitled to worker's compensation benefits because of his failure to provide defendant with timely notice. *See* T.C.A. § 50–6–201.

■ This Court examined the notice requirement in *Pentecost v. Anchor Wire Corp.*, 695 S.W.2d 183 (Tenn.1985). In that case this Court noted that the thirty day notice period may be tolled in certain situations.

An employee's reasonable lack of knowledge of the nature and seriousness of his injury has been held to excuse his failure to give notice within the 30–day period (citations omitted). Likewise, an employee's lack of knowledge that his injury is work-related, if reasonable under the circumstances, must also excuse his failure to give notice within 30 days that he is claiming a work-related injury. (citations omitted).

*Id.* at 185. This Court then held that the notice requirement is suspended " 'until by reasonable care and diligence it is discoverable and apparent that an injury compensable under the [worker's] compensation laws has been sustained.' ". *Id.* at 185; *see also Puckett v. N.A.P. Consumer Electronics Corp.,* 725 S.W.2d 674, 676 (Tenn.1987). However, once the employee is aware or reasonably should have been aware that he has sustained a compensable injury, the employee must comply with the notice provisions of T.C.A. § 50–6–201. *Pentecost,* 695 S.W.2d at 186; *Puckett,* 725 S.W.2d at 676. The foregoing applies whether the employee has sustained a gradual injury such as in *Pentecost,* or an injury from one single event such as in the case at bar.

■ In the instant case the chancellor found that plaintiff did not give notice within thirty days of the accident. However, the chancellor also found that this delay was reasonable under the circumstances, and that plaintiff gave timely notice upon the discovery that he had sustained a compensable injury. We cannot say that the evidence preponderates against those findings.

Next, defendant contends that the trial court erred in permitting plaintiff's vocational expert, James B. Adams, to testify because plaintiff did not seasonably supplement his answer to defendant's interrogatories requesting the names of all expert witnesses expected to testify.

On 11 April 1986, plaintiff, in response to defendant's interrogatories, indicated that the only expert witness to be called at trial was Dr. Gaines. In May of 1987, counsel for plaintiff informally advised counsel for defendant that plaintiff was considering using a vocational expert at trial. The expert was not identified at this time. On 3 June 1987, plaintiff selected Mr. Adams as his expert, and on 5 June 1987, Mr. Adams examined plaintiff. On Thursday, 11 June 1987, four days before trial, plaintiff's counsel delivered to defendant's counsel an unsworn supplemental response to defendant's interrogatories that indicated that Mr. Adams would testify as an expert. On 12 June 1987, defendant filed a motion in limine to exclude Mr. Adams' testimony.

When the trial commenced on 15 June 1987, defendant asked the chancellor for a ruling on his motion in limine. The chancellor asked counsel for defendant if he wanted time to get an expert and the following occurred:

Mr. Leader: No, Sir. I don't want more time. I want the trial to go forward, may it please the Court. I don't know what Mr. Adams has to say, and I'm not trying to tell—suggest anybody's possible course. One possible way might be voir dire of Mr. Adams. I know he apparently came from Kentucky or at least has a Kentucky telephone number.

The Court: Is Mr. Adams present, now?

Mr. Mayo: Yes, Your Honor, he is.

The Court: I'll give you some time to talk with him.

Mr. Leader: I could talk with him during the lunch break. I'm not suggesting we take a recess.

The Court: We'll go forward then.

Later in the trial when plaintiff called Mr. Adams as his witness, defendant again objected to the testimony. The chancellor allowed the expert to testify, but renewed his offer of time to prepare rebuttal or cross-examination if defendant felt additional time was necessary. After plaintiff concluded his direct examination of Mr. Adams, defendant did not request any additional time for preparation.

T.R.C.P. 26.02 allows a party through interrogatories to require the other party to identify any expert witnesses the other party expects to testify at trial along with the substance of the expert's testimony. In addition a party is under a duty to seasonably supplement his response to a request for the identity of expert witnesses expected to be called at trial. T.R.C.P. 26.05.

■ Under the provisions of the Tennessee Rules of Civil Procedure, various sanctions against a party are provided when a party abuses the discovery process. However, these sanctions are mainly for non-

compliance with orders of the court. *See* T.R.C.P. 37. No sanctions against a party are provided for the failure to "seasonably" supplement a response to an interrogatory requesting the identity of expert witnesses expected to testify at trial. Although the rules do not provide a sanction for abuse of the discovery process, the inherent power of trial judges permits the trial judge to take appropriate corrective action against a party for discovery abuse. *Strickland v. Strickland*, 618 S.W.2d 496, 501 (Tenn.App.1981).

Excluding the testimony of an expert witness may be an appropriate sanction for failure to name the witness. However, other sanctions may be appropriate where the failure to name an expert witness is not knowing and deliberate. In determining the appropriate sanction the trial judge should consider:

1. The explanation given for the failure to name the witness.
2. The importance of the testimony of the witness;
3. The need for time to prepare to meet the testimony; and
4. The possibility of a continuance.

*Id.* The trial court's determination of the appropriate sanction to be imposed will not be disturbed on appeal unless the court commits an abuse of discretion. *See Brooks v. United Uniform Co.*, 682 S.W.2d 913 (Tenn.1984).

In the instant case, the chancellor determined that the appropriate remedy was to grant the defendant a continuance, rather than excluding the testimony of the expert. Defendant chose not to accept a continuance. We cannot say that the chancellor abused his discretion by offering as a remedy a continuance.

Finally, defendant argues that the evidence presented does not support the trial court's finding that plaintiff has incurred a sixty percent permanent partial disability to the body as a whole.

Defendant contends that plaintiff has failed to prove the permanency of his disability by expert testimony. *See Owens Illinois, Inc. v. Lane*, 576 S.W.2d 348 (Tenn.1978). Defendant acknowledges that plaintiff's expert, Dr. Gaines, testified that plaintiff has incurred a ten percent permanent partial disability to the body as a whole; but defendant contends that Dr. Gaines' testimony on permanence was not competent testimony because Dr. Gaines did not base his opinion upon either the American Medical Association Guides to the Evaluation of Permanent Impairment or the Manual for Orthopedic Surgeons in Evaluating Permanent Physical Impairment. *See* T.C.A. § 50–6–204(d)(3). This Court recently held in *Corcoran v. Foster Auto GMC, Inc.*, 746 S.W.2d 452 (Tenn. 1988), that use of one of the two guides named in the statute was unnecessary, although preferable, where causation and permanency have been established by expert testimony, because the issue then becomes the extent of vocational disability, not anatomical disability.

After reviewing the record in this case, we cannot say that the evidence preponderates against the trial court's finding that plaintiff has incurred a sixty percent permanent partial disability to the body as a whole as a result of the accident.

The judgment of the trial court is affirmed. Costs are taxed to defendant.

HARBISON, C.J., and COOPER, DROWOTA and O'BRIEN, JJ., concur.