IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 9, 2013 Session

# WILLIAM MICHAEL RAY ET AL. v. SOUTHERN TENNESSEE MEDICAL CENTER, LLC ET AL.

**Appeal from the Circuit Court for Franklin County**
**No. 17462cv      Thomas W. Graham, Judge**

**No. M2012-01227-COA-R3-CV - Filed June 25, 2013**

In this medical malpractice action, the jury entered a verdict in favor of the defendant doctor. On appeal, the plaintiff argues that the trial court erred in allowing a medical expert witness to testify. We find no error in the trial court's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, M.S., P.J., and RICHARD H. DINKINS, J., joined.

Richard D. Piliponis, Nashville, Tennessee, for the appellant, William Michael Ray.

Darrell G. Townsend, Nashville, Tennessee, for the appellee, Asher A. Turney.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

Dr. Asher A. Turney treated William Michael Ray in the emergency room of Emerald Hodgson Hospital in Sewanee, Tennessee on March 27, 2008. Mr. Ray was eventually transferred to Vanderbilt University Medical Center, where he was treated for a myocardial infarction. Mr. Ray and his wife, Sandra Ray, filed this medical malpractice action against Dr. Turney, the hospital, and several corporate entities on June 17, 2009. An amended complaint filed on September 8, 2011 named only Dr. Turney and Southern Tennessee Medical Center, LLC as defendants. (Southern Tennessee Medical Center, LLC operates Emerald Hodgson Hospital.) In their complaint, the plaintiffs alleged that Dr. Turney failed to timely diagnose and treat Mr. Ray; they asserted that a reasonable physician would not have failed to diagnose Mr. Ray's acute myocardial infarction or failed to transfer him to "a

qualified heart institute in a timely manner."

All claims against Southern Tennessee Medical Center, LLC were dismissed with prejudice on February 21, 2012. After the hospital's dismissal, the plaintiffs filed a motion in limine to prohibit Dr. Turney from calling expert witnesses not disclosed by him prior to the disclosure deadline. The plaintiffs wanted to prevent Dr. Andy Walker, an expert witness disclosed by the hospital and deposed by the plaintiffs, from testifying on behalf of Dr. Turney. The trial court overruled this motion.

The case went to trial before a jury in February and March 2012. The jury returned a verdict finding that Dr. Turney was not negligent in his treatment and diagnosis of Mr. Ray. On March 6, 2012, the trial court entered judgment on the jury verdict and dismissed the case. The trial court denied the plaintiffs' motion for a new trial or to set aside the verdict, and this appeal followed.

On appeal, Mr. Ray argues that (1) the trial court erred in allowing Dr. Walker to testify because Dr. Turney did not timely disclose him as an expert, (2) the trial court erred in failing to exclude Dr. Walker's testimony under the locality rule, and (3) the trial court failed to adequately perform its function as thirteenth juror.

ANALYSIS

(1)

Mr. Ray's argument is that the trial court erred in allowing Dr. Walker to testify as an expert witness because Dr. Turney did not disclose him as a witness prior to the deadline, the plaintiffs "materially relied" on the disclosures in settling their claims against the hospital, and Dr. Walker's testimony concerning the standard of care was "materially different" from the testimony of Dr. Thomas Nelson, an expert witness disclosed by Dr. Turney.

A trial court is vested with broad discretion in determining the "admissibility, qualifications, relevancy and competency of expert testimony." *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 263 (Tenn.1997); *see also Robinson v. LeCorps*, 83 S.W.3d 718, 725 (Tenn. 2002). Thus, we review a trial court's decision regarding expert witness competency and qualifications under an abuse of discretion standard. *Robinson*, 83 S.W.3d at 725; *Taylor v. Jackson-Madison Cnty. Gen. Hosp. Dist.*, 231 S.W.3d 361, 371 (Tenn. Ct. App. 2006). There has been an abuse of discretion "when the trial court reaches a decision against logic that causes a harm to the complaining party or when the trial court applies an incorrect legal standard." *Riley v. Whybrew*, 185 S.W.3d 393, 399 (Tenn. Ct. App. 2005). The trial court's decision will be upheld "'as long as reasonable minds can disagree as to the propriety of the

[trial court's] decision."' *Id.* at 399 (quoting *State v. Scott*, 33 S.W.3d 746, 751 (Tenn. 2000)).

In *Lyle v. Exxon Corp.*, 746 S.W.2d 694 (Tenn. 1988), our Supreme Court addressed factors to be considered in ruling on discovery violations regarding expert testimony:

> Excluding the testimony of an expert witness may be an appropriate sanction for failure to name the witness. However, other sanctions may be appropriate where the failure to name an expert witness is not knowing and deliberate. In determining the appropriate sanction the trial judge should consider:
>
> 1. The explanation given for the failure to name the witness.
> 2. The importance of the testimony of the witness;
> 3. The need for time to prepare to meet the testimony; and
> 4. The possibility of a continuance.
>
> [*Strickland v. Strickland*, 618 S.W.2d 496, 501 (Tenn. Ct. App. 1981)]. The trial court's determination of the appropriate sanction to be imposed will not be disturbed on appeal unless the court commits an abuse of discretion.

*Lyle*, 746 S.W.2d at 699. In *Lyle*, a workers compensation case, plaintiff's counsel disclosed a vocational expert four days prior to trial. *Id.* at 698. The defendant declined the court's offer of a continuance. *Id.* at 698-99. On appeal, the Supreme Court ruled that there was no abuse of discretion. *Id.* at 699.

In the present case, Dr. Walker had been disclosed as an expert witness by the hospital and was deposed by the plaintiffs; the plaintiffs were not surprised by the content of Dr. Walker's testimony. The plaintiffs settled with the hospital and, on February 8, 2012, Dr. Turney disclosed to the plaintiffs that he intended to use the hospital's expert witnesses. The trial began on February 21, 2012. We do not consider the plaintiffs' tactical decision to settle with the hospital to "avoid" Dr. Walker's testimony evidence of prejudice here. The plaintiffs did not request a continuance to prepare for Dr. Walker's testimony. We cannot say that the trial court abused its discretion in allowing Dr. Walker to testify.

(2)

Mr. Ray's next argument is that the trial court erred in failing to exclude Dr. Walker on the basis of the locality rule.

The proof requirements for a medical malpractice action are found in Tenn. Code Ann. § 29-26-115(a):

[T]he claimant shall have the burden of proving by evidence as provided by subsection (b):

(1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

The plaintiff must put on expert proof to establish the relevant standard of care, its breach, and causation. *Norris v. E. Tenn. Children's Hosp.*, 195 S.W.3d 78, 86 (Tenn. Ct. App. 2005).

With respect to the standard of care, subsection (a)(1) of Tenn. Code Ann. § 29-26-115 requires the plaintiff to prove either the standard of care in the community in which the defendant practiced at the time of the alleged injury or the standard of care in a community similar to the one in which the defendant practiced at the time of the alleged injury. As our Supreme Court has said, under Tenn. Code Ann. § 29-26-115(a)(1), "the conduct of doctors in this State is assessed in accordance with the standard of professional care in the community in which they practice or one similar to it." *Robinson*, 83 S.W.3d at 724. This is known as the locality rule.[1]

In *Shipley v. Williams*, 350 S.W.3d 527 (Tenn. 2011), our Supreme Court clarified the standards to be used by courts to determine whether a medical expert is qualified to testify in a medical malpractice case. *Shipley*, 350 S.W.3d at 532. After providing an extensive history of the locality rule and caselaw interpreting it, the Supreme Court set forth its

---

[1]Tennessee Code Annotated § 29-26-115(b) further provides:

No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or specialty in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred.

-4-

conclusions. *Id.* at 536-50. The Court emphasized that Tenn. Code Ann. § 29-26-115(b) provides the only three requirements for an expert witness to be competent to testify in a medical malpractice case. *Id.* at 550. Subsection (a) of Tenn. Code Ann. § 29-26-115 states the three elements a patient must establish for a medical malpractice claim: (1) the "recognized standard of acceptable professional practice in the profession and the specialty thereof . . . in the community in which the defendant practices or in a similar community . . .," (2) that the defendant breached this standard, and (3) that the defendant's negligent act or omission proximately caused the plaintiff's injuries. *Id.*

Citing principles of stare decisis, the Court in *Shipley* acknowledged the continuing applicability of the locality rule, "the requirement that a medical expert must demonstrate a *modicum of familiarity* with the medical community in which the defendant practices or a similar community." *Id.* at 552 (emphasis added). The Court gave the following guidance regarding the level of proof required to satisfy the locality rule:

> Generally, an expert's testimony that he or she has reviewed and is familiar with pertinent statistical information *such as* community size, hospital size, the number and type of medical facilities in the community, and medical services or specialized practices available in the area; has discussed with other medical providers in the pertinent community or a neighboring one regarding the applicable standard of care relevant to the issues presented; *or* has visited the community or hospital where the defendant practices, will be sufficient to establish the expert's testimony as relevant and probative to "substantially assist the trier of fact to understand the evidence or to determine a fact in issue" under Tennessee Rule of Evidence 702 in a medical malpractice case and to demonstrate that the facts on which the proffered expert relies are trustworthy pursuant to Tennessee Rule of Evidence 703.

*Id.* (emphasis added). The Court also rejected the requirement, adopted in some previous opinions of this court, that a medical expert have "personal, firsthand, direct knowledge" of the standard of care in the same community or a similar community as the defendant. *Id.* (quoting *Eckler v. Allen*, 231 S.W.3d 379, 386 (Tenn. Ct. App. 2006)).

The Court's summary of its key conclusions includes the following relevant statements:

> A claimant is required to prove . . . "[t]he recognized standard of acceptable professional practice . . . in the community in which the defendant practices or in a similar community." Tenn. Code Ann. § 29-26-115(a)(1). The medical expert or experts used by the claimant to satisfy this requirement must

demonstrate *some familiarity* with the medical community in which the defendant practices, or a similar community, in order for the expert's testimony to be admissible under Rules 702 and 703. Generally, a competent expert's testimony that he or she has reviewed and is familiar with pertinent statistical information such as community size, hospital size, the number and type of medical facilities in the community, and medical services or specialized practices available in the area; has had discussions with other medical providers in the pertinent community or a neighboring one regarding the applicable standard of care relevant to the issues presented; *or* has visited the community or hospital where the defendant practices, will be sufficient to establish the expert's testimony as admissible. . . . A medical expert is not required to demonstrate "firsthand" and "direct" knowledge of a medical community and the appropriate standard of medical care there in order to qualify as competent to testify in a medical malpractice case.

*Id.* at 554 (emphasis added).

Having set out the applicable standards, the Supreme Court proceeded to apply these principles to the expert testimony at issue in the case before the Court. *Id.* Dr. Rerych, a board-certified general surgeon who practiced in Asheville, North Carolina, had travelled to Nashville to testify as a medical expert on one or two previous occasions and had toured one of the community hospitals in Nashville. *Id.* He testified that he had reviewed demographic information about Nashville and the hospital where Dr. Williams practiced; he opined that Asheville was a similar community to Nashville "as it applies to the facts and circumstances of this case." *Id.* Dr. Rerych admitted that he was not familiar with the characteristics of the hospital where Dr. Williams practiced. *Id.* In seeking to have Dr. Rerych's testimony excluded, defense counsel emphasized his testimony in response to questions regarding a national standard of care. *Id.* at 555. The Supreme Court concluded that "Dr. Rerych sufficiently established his familiarity with the recognized standard of acceptable professional practice in the community in which the defendant practices or in a similar community." *Id.* at 556. Thus, the Court found that the trial court erred in disqualifying Dr. Rerych.

In the present case, Mr. Ray argues that the trial court erred in allowing Dr. Walker to testify because he did not demonstrate the necessary level of familiarity with the community in which Dr. Turney practiced or a similar community. We disagree. This case required an expert witness to be familiar with the standard of care for a doctor practicing in a small rural hospital regarding the diagnosis and transfer of a patient who presents with chest pain. Dr. Walker described his background of working in the emergency rooms of hospitals of various sizes. He practiced at Vanderbilt Medical Center from 1992 to 1999 and

testified that Vanderbilt is a world class medical center. Since 1999, Dr. Walker had worked at Summit Medical Center in Hermitage, Tennessee, a smaller hospital without the capability to do open heart surgery.

Dr. Walker testified that he was familiar with the emergency department of Emerald Hodgson Hospital:

A. It's probably the smallest ER I've ever seen. It's a four-bed ER.
Q. Okay. And the hospital itself has limited capabilities?
A. Yes.
Q. What does it not have, for example?
A. Well, they now have a CT scanner. At the time of this case they didn't even have that. And, of course, they still don't have a cath lab.
Q. All right. Now, when you were at Vanderbilt, working in that emergency department, was part of your responsibility to take transfers from other emergency rooms in the mid-south?
A. Yes.
Q. Did that include tiny, tiny emergency rooms?
A. Much of the time, yes.
Q. All right. Did some of those hospitals, those emergency rooms include transfers from emergency rooms in McMinnville, Tennessee?
A. Yes.
Q. Carthage, Tennessee?
A. Yes.
. . .
Q. You've been at Summit since 2000, correct?
A. Yes.
Q. Do you still receive referrals from doctors in small emergency rooms in small towns?
A. Yes.
Q. How often do you do that?
A. Unlike at Vanderbilt, where I did that probably once an hour, in my current job I may do it once a day, once every other day.
Q. And will those referrals from those hospitals—and we'll get to the particulars on those and their communities in a minute. But will they include chest pain transfers?
A. Yes.
Q. All right. Now, when you get a patient—not just a chest pain patient, but any transfer from an outlying community, do you talk to the doctor and learn what he's done with that patient?

A. Always.

Q. You learn what the patient's presentation was?

A. Yes.

Q. Do you learn what the capabilities of that emergency room are?

A. Yes.

Q. And do you therefore believe you understand the standard of acceptable professional practices in those smaller emergency rooms?

A. I am confident I do.

Q. All right. Now, let's—

THE COURT: Let me ask you this. Is it a general rule in this kind of hospital we're talking about, if you have a serious suspect of a heart attack you get the patient transferred immediately? Is that just common sense?

A. No, Your Honor.

THE COURT: Okay. I'll let you explain.

BY MR. TOWNSEND:

Q. Now, at Summit, for the past twelve years, have you accepted transfers from patients from Carthage, Tennessee?

A. Yes.

Q. Do you know what the population of Carthage, Tennessee is?

A. Roughly two thousand.

Q. All right. Do you know what the characteristics of the emergency room are they have there in their little hospital?

A. Yes.

Q. What is it?

A. They have part day double coverage, with big chunks of single coverage.

Q. How many beds do they have there?

A. I can't tell you exactly, but it's less than ten.

Q. Okay. Now, have you accepted transfers from doctors in Jamestown?

A. Yes.

Q. Do you know what the population, approximately, is at Jamestown?

A. Again, I think it's roughly two thousand.

Q. And in these cases, again, you've talked to the doctor, and you've learned what the presentation was, and what the capabilities of the ER is, correct?

A. Yes.

Q. Are these ERs similar to the emergency room at Emerald Hodgson Hospital?

A. Substantially.

Q. All right.

. . .

Q. All right. Now, based on what we've been through to this point, do you

-8-

believe that you are familiar with standards of care for small rural emergency rooms in the communities of Carthage and Jamestown, when it comes to treating chest pain patients?

A. I do.

. . .

Q. Now, do you believe that Carthage and Jamestown are communities which are similar to Sewanee?

A. Substantially.

Q. All right. How so?

A. They may be a little bit bigger. But I understand small rural communities and small town hospitals. I grew up in a small town in East Tennessee, worked in that hospital before I went to medical school. And have worked in tiny ERs where I was the only doctor in the building, much less the ER.

Q. Now, do you also interact with doctors who work at emergency rooms in small towns through your professional associations?

A. Yes. I'm on the board of directors of the American Academy of Emergency Medicine. So I talk to doctors in all kinds of practice settings regularly.

Q. And including doctors in small emergency rooms in small communities?

A. Yes.

Q. Similar to Sewanee, Tennessee?

A. Yes.

Q. And similar to Emerald Hodgson Hospital.

A. Some even smaller and more isolated.

. . .

Q. Now, what is the population of Sewanee?

A. Oh, gosh, probably—it's so tiny, it depends—well, actually, I was thinking of Monteagle. I was gonna say, it depends on whether or not school's in session. I don't know, five thousand.

Q. All right. Do you believe that Sewanee's in a similar community as Carthage and Jamestown from which you accept referrals?

A. Yes.

Q. Okay. Now, Emerald Hodgson itself—well, we've mentioned, you know, that it has four beds in its ER. It doesn't have any cardiologist on call, does it?

A. No.

Q. Single coverage all the time, correct?

A. Yes.

Q. And the nearest tertiary care center is an hour or so away, correct?

A. It would be either Huntsville or Chattanooga.

Q. Is that characteristic of a tertiary care center an hour or so away, also

similar to what the—Carthage and Jamestown have to deal with?

A. Carthage is a little bit closer, but, yes.

Q. All right. Now based on all of this information that you have gathered and have related today, are you confident that you know that standard of care for treating chest care patients in an emergency room—a small emergency room, in a small city such as Sewanee, or a similar community?

A. I have no doubt.

Dr. Walker later testified that he visited Emerald Hodgson Hospital on the morning of the day when he gave his testimony in court.

In arguing against Dr. Walker's familiarity with the standard of care at Emerald Hodgson Hospital, Mr. Ray emphasizes Dr. Walker's failure to testify to statistical information about the community of Sewanee "beyond a general guess at population" and failure to demonstrate similarities between the communities he asserted to be similar to Sewanee (Jamestown, Carthage). In *Shipley*, however, the Court held that an expert witness must demonstrate only "some familiarity" or "a modicum of familiarity" with the medical community. *Shipley*, 350 S.W.3d at 552, 554. Moreover, the required level of familiarity can be established by familiarity with pertinent statistical information, discussions with knowledgeable medical care providers, or visiting the community or hospital. *Id.* We find no abuse of discretion in the trial court's decision to allow Dr. Walker to testify regarding the standard of care in this case.

(3)

The plaintiffs filed a motion for new trial, which was denied by the trial court. Mr. Ray argues that the trial court failed to adequately perform its function as thirteenth juror by "allowing the jury to hear, consider, and weigh improper expert testimony [from Dr. Walker]" and failing to correct that error.

In ruling on a motion for new trial, the trial court acts as thirteenth juror; therefore, it "must independently weigh the evidence, determine the issues presented, and decide whether the jury's verdict is supported by the evidence." *Dickey v. McCord*, 63 S.W.3d 714, 718 (Tenn. Ct. App. 2001). A reviewing court must presume that the trial court properly performed its role as thirteenth juror when the trial court approves the verdict without comment. *Id.* The judgment should be reversed and a new trial ordered only if the record includes "statements that the trial court was dissatisfied with or disapproved of the jury's verdict or when the trial court absolved itself of or misconstrued its function as the thirteenth juror." *Id.* at 719.

Because we have already concluded that the trial court's decision to allow Dr. Walker to testify was not erroneous, there is no merit to Mr. Ray's thirteenth juror argument.

CONCLUSION

The judgment of the trial court is affirmed in all respects. Costs of appeal are assessed against the appellants, and execution may issue if necessary.

_____

ANDY D. BENNETT, JUDGE